DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**CARLO G. CHIARELLA,**
Appellant,

v.

**ROBERTA A. FORD,**
Appellee.

No. 4D2022-2874

[February 21, 2024]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; G. Joseph Curley, Judge; L.T. Case No. 502019CA012452.

Philip M. Burlington and Jeffrey V. Mansell of Burlington & Rockenbach, P.A., West Palm Beach, and Casey D. Shomo of Casey D. Shomo, P.A., Palm Beach Gardens, for appellant.

Kansas R. Gooden of Boyd & Jenerette, P.A., Miami, and Kevin D. Franz of Boyd & Jenerette, P.A., Boca Raton, for appellee.

GROSS, J.

Carlo Chiarella, the plaintiff below, appeals a final judgment awarding him $140,000 from the defendant, Roberta Ford, in this automobile negligence case. We write to address one issue—the plaintiff's contention that the jury verdict was inconsistent because it awarded him the expenses of one spinal fusion surgery but found no permanent injury. We hold that the plaintiff failed to preserve the issue for appellate review because he did not request that the verdict be resubmitted to the jury.

### *The Lawsuit*

The plaintiff sued the defendant for personal injuries arising out of an auto accident. The defendant admitted fault, but disputed (1) the cause of the plaintiff's injuries, (2) the permanency of the plaintiff's injuries, and (3) the damages sustained by the plaintiff.

### The Accident

In July 2017, the plaintiff's BMW was rear-ended by the defendant's Tesla. The impact pushed the BMW into another vehicle. The plaintiff described the impact as "pretty hard," explaining that the airbag deployed, he suffered abrasions and felt like he was "punched in the face." The BMW was deemed a total loss.

### The Plaintiff's Pre-Accident Medical History

The plaintiff sustained several injuries at the gym between 2006 and 2012 from doing bench press or squats, causing neck and lower back pain for which he sought treatment with chiropractors. The plaintiff also had a bicycle accident in 2014, resulting in a visit to the ER where he underwent a cervical x-ray and sought treatment for a neck sprain and a back sprain. The cervical x-ray showed retrolisthesis, an abnormal finding, but there was never any recommendation from a healthcare provider to get an MRI or follow up with a spine surgeon.

Beginning in March 2015, the plaintiff was treated by a chiropractor for back and neck issues, including radiating leg pain and neck pressure. Despite not disclosing his bicycle accident or cervical x-ray to the chiropractor, the plaintiff mentioned numbness on his intake form, which could have signified disc involvement. The chiropractor observed the plaintiff's limited lumbar motion and frequent pain, which impacted his daily activities. The plaintiff did not follow the chiropractor's two-week treatment plan.

In November 2015, a different chiropractor treated the plaintiff for chronic lower back pain and sciatica dating from 2009, but the plaintiff did not complete the prescribed chiropractic plan. The plaintiff received more chiropractic treatment for back pain in 2016. The plaintiff also saw a chiropractor for a neck strain sustained at the gym about three months before the 2017 auto accident.

### The Plaintiff's Post-Accident Medical Treatment

The plaintiff was treated at an emergency room on the day of the accident. Ten days later, he began seeing Dr. Chung, an orthopedic surgeon.

After undergoing MRIs in July 2017, the plaintiff was diagnosed with bulges, tears, and herniations on the cervical and lumbar spines. The findings were abnormal for a 35-year old. However, the 2017 MRIs did not

reveal acute compression of the cervical spine. The plaintiff initially underwent conservative treatments, including anti-inflammatory medication, steroid injections, and physical therapy. Dr. Chung testified that the plaintiff had an 80-90% improvement in the neck as of December 2017.

During this time, the plaintiff underwent physical therapy at a clinic owned by a chiropractor who employs physical therapists on his staff. The plaintiff stopped treatment there in February 2018, when he described his cervical and lumbar pain as "worst two, best zero, current one." In September 2018, the plaintiff resumed treating with the chiropractor's office upon noticing increased symptoms after starting a new restaurant business.

The plaintiff resumed seeing Dr. Chung in October 2018 due to the flare-up of his neck and back pain. In March 2019, the plaintiff underwent MRIs which showed increased spinal abnormalities, with his worst pathology in the cervical spine, so Dr. Chung recommended that he undergo neck surgery. Dr. Chung testified that worsening MRI findings can be due to either an intervening trauma or the progression of the initial injury.

In April 2019, the plaintiff went to the ER after turning his neck at work and experiencing a lot of pain. The plaintiff gave a history in which he reported that "he had neck pain for the past two years status post his [auto accident]; and he just turned his neck, and he had an acute worsening." Dr. Chung opined that the plaintiff "simply turning his neck" was not an intervening trauma, adding that he had already recommended neck surgery to the plaintiff before the incident.

In June 2019, the plaintiff underwent cervical fusion surgery performed by Dr. Chung. Dr. Chung acknowledged that no lumbar complaints were documented at that time. By December 2019, the plaintiff's radicular pain had resolved but he continued to have posterior neck discomfort.

Subsequently, due to intermittent flare-ups of pain in his lower back, the plaintiff was referred for an updated lumbar MRI in February 2021, and he underwent lumbar fusion surgery performed by Dr. Chung in March 2021.

At trial, the plaintiff introduced a medical bill index reflecting a total of nearly $350,000 in past medical expenses, including about $76,000 for conservative care. The remainder of the bills related to surgical care.

The plaintiff testified that he still had neck and back pain after his surgeries. Dr. Chung recommended future care including physical therapy, medication, injections, MRIs, and potential future neck surgery. At trial, the plaintiff presented evidence that his future medical expenses, reduced to present value, would total over $1.1 million.

### *Competing Opinions on Causation and Permanency*

Dr. Chung testified that all the plaintiff's post-accident injuries and treatment, including both surgeries, were caused by the July 2017 auto accident. Dr. Chung said that the plaintiff sustained permanent injuries from his treatment and from the car accident. Dr. Chung explained that "a fusion by definition will limit [his] range of motion," and that "there's been a permanent change to his spine." Applying American Medical Association guidelines, Dr. Chung gave the plaintiff a 9% impairment rating for his neck, plus a 9% impairment rating for his back.

The defendant's only witness, an orthopedic spine surgeon, testified that: (1) the plaintiff had neck and back problems prior to the July 2017 auto accident; (2) the plaintiff suffered a sprain/strain of the neck and back as a result of the auto accident; (3) the plaintiff did not suffer a permanent injury to his cervical or lumbar spine resulting from the auto accident; (4) the plaintiff's need for surgery was not related to the auto accident; and (5) six-to-eight weeks of chiropractic care or physical therapy was reasonable. However, he conceded on cross-examination that if the jury believed the neck surgery was related to the crash, "[t]he surgery in and of itself would be considered a permanent injury" because the plaintiff has "had a permanent change of the way his neck works, with permanent implants put in his neck."

### *The Verdict and Post-Verdict Motions*

The jury found that the defendant's negligence was a legal cause of damage to the plaintiff, awarded the plaintiff $150,000 for past medical expenses, awarded nothing for future medical expenses, and found that the plaintiff did not sustain a permanent injury.

Immediately after the clerk published the verdict, the plaintiff's counsel objected that the verdict was inconsistent without a finding of permanency because the jury's award of $150,000 necessarily included "some degree of invasive care, potentially surgery." He argued that if the jury "considered a surgery" as part of the damages, then "it is a permanent injury." He contended that the jury was not free to disregard uncontroverted testimony and speculate outside of the record.

4

By contrast, defense counsel maintained that the verdict was in the proper form, arguing that the jury was free to disregard certain testimony and that the jury could award past medical expenses without finding a permanent injury.

The plaintiff's counsel said he was "simply bringing it to Your Honor's attention, because I don't see how they get to that number without having considered something that by evidence . . . would involve them having to next find a permanent injury."

The plaintiff's counsel did not specifically ask the trial court to reinstruct the jury or send the case back for further deliberations.

The trial court then ruled that it would not "overturn [the verdict] or suggest that the jury should go back and deliberate."

After the verdict, the plaintiff moved for a new trial, arguing, among other things, that the verdict was inconsistent. The trial court granted a hearing on whether the verdict was inconsistent, but denied the motion for new trial on the other grounds raised.

Following the hearing, the trial judge entered a detailed order denying the motion for new trial on the ground of an inconsistent verdict. The court entered final judgment for the plaintiff for $140,000 after accounting for setoffs.

### *The Plaintiff Failed to Preserve the Issue of the Inconsistency of the Verdict*

"To preserve the issue of an inconsistent verdict, the party claiming inconsistency must raise the issue before the jury is discharged and *ask the trial court to reinstruct the jury and send it back for further deliberations.*" *Coba v. Tricam Indus., Inc.,* 164 So. 3d 637, 644 (Fla. 2015) (emphasis added) (internal quotation marks omitted). One of the reasons for this rule of preservation is to prevent the complaining party from strategically avoiding the risk of "having the award unfavorably adjusted." *Id.* An objection alone is insufficient because Florida law requires that there be a specific request to resubmit the matter to the jury. *See Barreto v. Wray*, 40 So. 3d 779, 779 (Fla. 3d DCA 2010) (observing that "[i]n the case before us, although the Barretos' counsel did tell the judge at sidebar that he 'thought' the amended verdict was inconsistent, Florida law requires that there be a specific request to resubmit the matter to the jury"); *Adoro Mktg. v. Da Silva*, 623 So. 2d 542, 543 (Fla. 3d DCA 1993)

5

(holding that "[d]efense counsel, having not requested the jury be permitted to reconsider its verdict in light of the inconsistency, cannot now seek reversal on that basis," where defense counsel had immediately "argued that the jury's verdict was inconsistent" and had sought a judgment directed in the defendants' favor but did not "ask the trial judge to permit reconsideration by the jury, still sequestered").

In recent cases, the Florida Supreme Court has emphasized that it is not enough to generally talk about an objection; to preserve an issue for appeal, a litigant must assert the "clear and specific" objection required by the law. For example, in *State v. Pacchiana*, 289 So. 3d 857, 859 (Fla. 2020), the defendant objected to the state's exercise of a peremptory challenge and asked for a "race neutral reason." The prosecutor responded that the potential juror was "a Jehovah Witness." *Id.* The defense attorney pointed out that "[t]hat's a religious based strike." *Id.* The trial court overruled the defense objection to the state's exercise of the peremptory challenge. *Id.* at 860.

After this court considered the merits of the defendant's challenge, the case reached the Florida Supreme Court, which held that the objection based on the juror's religion had not been properly preserved:

> [A]t the time the strike was exercised, Pacchiana did not articulate an objection that the State was exercising its peremptory challenge to unconstitutionally exclude Jehovah's Witnesses from the jury. Thus, no objection to the strike as being a constitutionally impermissible religion-based strike was contemporaneously preserved in the trial court. *Counsel's comment, "[t]hat's a religious based strike" was not itself a clear and specific legal objection to the constitutionality of the strike based on religion . . . .*

*Id.* at 861–62 (emphasis supplied); *see also Ellison v. Willoughby*, 373 So. 3d 1117, 1120 (Fla. 2023) (stating that "faithful enforcement of this preservation rule promotes accuracy, efficiency, and fairness in adjudication").

Here, the issue of an inconsistent verdict was unpreserved because the plaintiff's counsel did not ask the trial court to reinstruct the jury and send the matter back for further deliberations. Before the jury was discharged, the plaintiff's counsel argued the inconsistency of the verdict at length. But, in the last sentence of his argument, the plaintiff's counsel stated that he was "simply bringing it to Your Honor's attention[.]" The plaintiff's counsel never made a specific request to send the matter back to the jury

6

for reconsideration; he never made it clear on the record that he was willing to request further deliberations and risk having the jury's award even more unfavorably adjusted. After plaintiff's counsel concluded his argument, the trial judge's sua sponte statement that he would not "suggest that the jury should go back and deliberate" did not relieve the plaintiff from actually requesting that relief in order to preserve the issue for appeal.

We have considered the other points raised and conclude that there was no reversible error.

KLINGENSMITH, C.J., and CONNER, J., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***